**RELIABLE LIFE INSURANCE COMPANY et al., Appellants,**

**v.**

**BROWN & ROOT, INC., Appellee.**

**No. 6043.**

Court of Civil Appeals of Texas, Waco.

Oct. 16, 1980.

Rehearing Denied Nov. 20, 1980.

Joel W. Cook, Schlanger, Cook, Cohn, Mills & Grossberg, Houston, Kenneth C. Kaye, League City, for appellants.

William S. Clarke, W. Briscoe Swan, Jr., Law Offices of Edgar W. Monteith, Houston, for appellee.

OPINION

JAMES, Justice.

This is a suit involving a construction contract and a Mechanic's and Material-

man's Lien arising therefrom. Plaintiff–Appellee Brown and Root, Inc. brought this action against Defendant–Appellant Houston Leisure Park Company to recover the unpaid balance of charges claimed owing for materials and labor furnished in the construction of a recreational vehicle camp in Harris County, Texas, and to foreclose its claimed lien against the property of the Defendant. Brown and Root joined Appellant Reliable Life Insurance Co. as Defendant in the suit below for the purpose of establishing the priority of its (Brown and Root's) lien over any and all adverse claims that Reliable Life Insurance Co. might assert to the property in question. Trial was to a jury and judgment on the verdict granted all relief sought by Brown and Root against both Defendants. We affirm the trial court's judgment.

Since almost all facts pertinent to the judgment were hotly contested in the trial below, we will initially rely on the pleadings in the case to portray the factual background of the suit and to summarize the contentions of the parties. Evidence in support of these pleadings will be reviewed as necessary to the disposition of errors assigned.

As Plaintiff, Brown and Root alleged that on or about January 13, 1972, it entered into a written contract with Houston Leisure Park whereby it agreed to construct a recreational vehicle camp at a contract price of $299,000.00; that this original contract, by its express terms, called for Brown and Root to clear, grade, and surface all roads, streets, parking sites, and parking lots, to install underground utilities, including water and sewage lines, and to construct a sewage lift station; that on various dates subsequent to January 13, 1972, Houston Leisure Park entered into written supplemental agreements with Brown and Root which agreements called for the additional construction of buildings and utilities on the camp site at an additional cost of $47,368.62; that between the dates of January 13, 1972 and March 28, 1974, Brown and Root performed the contract as agreed by the parties; that Houston Leisure Park had promised to pay Brown and Root the sum of $351,415.84, but had only paid $257,685.85, leaving the sum of $93,729.99 unpaid; that payment had been demanded but that Houston Leisure Park failed and refused to pay said sum or any part thereof; that on May 28, 1974, Brown and Root filed with the County Clerk of Harris County, Texas, a verified account of its claim for labor and materials furnished to Houston Leisure Park, thereby establishing its statutory and constitutional lien on the property of Houston Leisure Park; and that the verified claim was duly recorded. Brown and Root also alleged that Defendant Reliable Life Insurance Co. was claiming some right, title or interest in and to the property in question "the exact nature of which (was) not known" but, in any event, that the right, title and interest of Reliable, if any, was junior, inferior and subject to the charge and liens of Brown and Root.

By way of Supplemental pleadings, Brown and Root alleged that "In the event the defendants herein plead or attempt to prove that Plaintiff, Brown and Root, Inc. did not perform the work alleged in its original Petition in accordance with the original Plans and Specifications referred to in the construction contracts set forth and described in said original Petition, then Plaintiff alleges that all such work was performed in accord with and in compliance with the original Plans and Specifications as changed, altered and amended by both written and parol agreements made between Plaintiff and Defendants."

"And Plaintiff further alleges that even though the original Plans and Specifications were changed, altered, or amended as above alleged, the work was performed in substantial compliance with the original Plans and Specification; and in any instance where the completed work varied from the original Plans and Specifications, such work was of greater value, utility, convenience and safety than . . . if performed according to the original plans and specifications."

Defendant Houston Leisure Park responded with a general denial and specially pleaded that "work allegedly performed by

Plaintiff ... was not in conformity with the requirements of the contract ... in that Plaintiff failed to provide and construct roads, streets, park sites and parking areas with a minimum of 6–inch (compacted) cement stabilized shell base, thereby causing a rapid depreciation and deterioration of the said roads, streets, park sites and parking areas, and reducing the value of the work and construction performed by Plaintiff by more than $90,000.00."

Defendant Reliable Life Insurance Company also responded with a general denial and specially pleaded that on or about April 9, 1973, First Mortgage Co. of Texas, Inc. loaned to Houston Leisure Park the sum of $545,000.00 and that a Deed of Trust securing the indebtedness was executed by Houston Leisure Park on the property in issue in this lawsuit; that the funds from this loan to the extent of $396,731.68 were used to pay a first lien held by First Texas Mortgage REIT [1] and to finance the construction of improvements on the property in question; that again on March 4, 1974, First Mortgage Co. loaned funds to Houston Leisure Park, increasing the principal indebtedness to First Mortgage Co. from $545,000.00 to $595,156.47; that a note for this principal amount and a Deed of Trust securing the note were executed by Houston Leisure Park at that time; that both of these notes and the Deeds of Trust securing them were purchased by Reliable for valuable consideration and that Reliable Life Insurance Company is the holder in due course of the indebtedness and an innocent purchaser for value of the "liens, rights, remedies and equitites" created by the Deeds of Trust securing the indebtedness; that at the time the loans were made and the Deeds of Trust executed there was no work in progress on the property in question and there was no evidence of any construction on the property subsequent to October 1, 1972; that nothing on the property disclosed any work in progress at the time of the loans or at the time of the assignment to Reliable; that all work by Brown and Root on the property in question ceased on or about August 26, 1972; and that by reason of all of these facts Reliable's lien was first and superior to any lien claimed by Brown and Root.

Reliable further pleaded that Brown and Root had not substantially performed the contract in question for the reason that the roads and parking areas were not constructed in compliance with contract specifications; and that Brown and Root had failed to perfect a valid statutory Mechanic's and Materialman's Lien on the property because it had failed to file its lien affidavit within 120 days of the actual "accrual of indebtedness" as required by law; that the work contemplated by the contracts of Brown and Root was completed, with the single exception of a small piece of work costing $4,604.60 which remained incomplete, on August 26, 1972; that Brown and Root "abandoned" the job on August 26, 1972 and performed no further work until December of 1973; that in any event the additional work costing $4,604.60 was completed in December, 1973 and the indebtedness accrued therefore on January 10, 1972; that Brown and Root's lien was not filed of record until May 28, 1974, more than 120 days after the indebtedness had accrued; that alternatively Houston Leisure Park had materially breached the construction contract in October 1972 by failing to pay its installment payment as provided for by the contract; that by reason of this breach the indebtedness accrued in November of 1972 and the lien affidavit was also not timely filed.

Trial was to a jury which found that:

(1) "Brown and Root, Inc. substantially performed the work for Houston Leisure Park Company as set out in the contracts which are Plaintiff's Exhibits 2 through 8 ...";

(2) "the amount of money, if any, owed by Houston Leisure Park for work

1. At the time of trial Reliable not only attempted to trace its lien to the Deed of Trust lien acquired by First Texas Mortgage REIT, but also attempted to establish its right through equitable subrogation to vendors' liens which had existed on the property prior to the Deed of Trust lien of First Texas Mortgage REIT.

done and materials furnished by Brown and Root, Inc. under the contracts in question" was $93,729.99;

(3) "the actual construction of the improvements at the site of Houston Leisure Park was commenced, or materials were furnished to the land upon which the improvements were to be made for use thereon before February 14, 1972";

(4) "the actual construction of the Houston Leisure Park improvements and the furnishing of materials on the land on which the improvements were being made continued with 'reasonable diligence' on the part of Brown and Root, Inc. from before February 14, 1972, until after January 1, 1974."

The jury failed to find that Reliable Life Insurance Company was a "purchaser in good faith for a valuable consideration, without notice of any claim by Brown and Root, Inc." of either of the notes originally executed to the order of First Mortgage Co. and later assigned by First Mortgage Co. to Reliable.

On this verdict the trial court rendered judgment that Brown and Root recover from Houston Leisure Park the sum of $93,729.99 plus interest plus $10,000.00 attorney's fees; that Brown and Root have a lien against the property of Houston Leisure Park Co., that the lien shall be a first lien, prior to any lien held by Reliable Life Insurance Co. in the amount of the judgment (less attorney's fees) and that the lien be foreclosed against all defendants and the property be sold to satisfy the judgment.

Reliable Life Insurance and Houston Leisure Park have jointly perfected their appeal assigning twenty-nine points of error which we will summarize and consider as five major contentions.

Appellants' first major contention is that there is no evidence, or in the alternative, insufficient evidence to support the jury's finding that Brown and Root substantially performed the contract(s) in evidence. The special issue on which this contention is predicated was framed as follows:

"Do you find from a preponderance of the evidence that Brown and Root, Inc. substantially performed the work for Houston Leisure Park Company as set out in the contracts which are Plaintiff's Exhibits 2 through 8, together with the plans (Plaintiff's Exhibit 13) and the specifications (Plaintiff's Exhibit 11)?

"By the term 'substantially perform' is meant that the work was essentially performed in good faith, in compliance with the terms of the contracts, and any omissions or deviations from the contracts are inadvertent and unintentional, are not due to bad faith, and do not impair the work as a whole."

The jury answered affirmatively that Brown and Root had substantially performed the contracts in issue. Appellants argue generally that Brown and Root admitted that there were deviations from the original contract and that, in fact, the whole case was tried on a theory that the contracts referred to in the above-quoted special issue were altered by the agreement of the parties and that the work was performed in accordance with the amended contract.

There was indeed much evidence that many day-to-day alterations were made as a result of discussions and agreements between an on-site representative of Brown and Root and an on-site representative of Houston Leisure Park Company. Several witnesses testified that such changes were necessary because of the peculiar circumstances of this project. For example, the original plans and specifications were drawn by a firm in Memphis, Tennessee, which had minimal contact with the actual situs of the construction before drawing the plans. One Brown and Root witness testified that he had to more or less "guess" the location of roads and parking sites from the original site drawing provided by the Memphis firm because the landmarks referred to in the plan either did not exist or were not in the places represented by the drawing. Consequently he had to construct a new working drawing which was used for the project.

Despite these day–to–day "changes," there is evidence that the completed project substantially complied with the *original* specifications of the contract. Mr. Earl Cooper, an employee of Houston Leisure Park Company who was designated as "manager of the construction project," testified that in June of 1973 he prepared a "punch list" of objections by Houston Leisure Park to the construction, which objections had to be cured before final acceptance of the project by Houston Leisure Park. He testified that this checklist was prepared by reference to the original plans and specifications without regard to any changes or modification which had been implemented during the construction. He further testified that all of the objections listed had been cured by Brown and Root with the exception of two, to–wit: (1) the electrical connections at the respective "parking pads" were not placed at the end of the pads in close proximity to the sewer connections as called for by the plans, but were placed at the opposite end of the respective pads near the water connections; and (2) the grade on some of the streets was not at the .02% gradient specified by the contract but was at a generally steeper gradient which varied somewhat throughout the park site. There was testimony that neither of these deviations from the plan was detrimental, but to the contrary that the deviations might even have been beneficial to the park. Witness Cooper testified that the placements of the electrical outlets near the sewer outlets as shown on the plans created a potentially hazardous condition in which electrical sparks from the electrical outlet could ignite any sewer gas escaping from the sewer connection and cause explosions and fire. He further testified that such explosions and fires had occurred in a Las Vegas Park, a project wherein the electrical and sewer connections were placed in accordance with the original plans for the Houston Leisure Park project. Also a Mr. Reidenbach, who was an employee of Houston Leisure Park from approximately January of 1972 until August or September of 1972 and who was designated as supervisor of construction during that period, testified that he actually directed the placement made by Brown and Root of the electrical connection because most, if not all travel trailers or recreational vehicles had the water and electrical connections on the same side of the vehicle and separation of these two connections would require the use of electrical extension cords which would be an additional expense and an additional source of trouble for the park and for the customer.

With regard to the gradient of the streets, there was considerable testimony that the park was located in a low–lying area which experienced greater than average rainfall and that large amounts of water collected in the park because there was not a sufficient gradient of the ground surface to allow surface water to drain properly. In fact many witnesses testified *that the major problem in this construction* project was the drainage of the surface water. The original plans and specifications called for a gradient of .02%, i. e. a drop of two–tenths of a foot every one hundred feet. Brown and Root witnesses testified that Houston Leisure Park was advised before the project was finalized that drainage was going to be a problem and that storm sewers were really the only way to adequately drain the park; however, the installation of storm sewers would have considerably increased construction costs and Houston Leisure Park chose not to include these in the project. Most of the testimony indicated that the selection of the .02% slope was predicated on the strong desire of the owners of the park to preserve the natural wooded character of the site. It was feared that a steeper gradient could only be accomplished by severely cutting away parts of the surface, thereby exposing the roots of trees established in the area, and by dumping large quantities of fill dirt in other areas, thereby smothering the roots of trees in those areas. Several witnesses testified that the increased gradient was an improvement rather than a defect in the construction at this particular site.

We have described only part of the testimony in support of the jury's finding of

"substantial performance." Having reviewed the entire record, we have concluded that the evidence is both legally and factually sufficient to support the jury's finding in this regard. Appellants' first contention is overruled.

Appellants' second contention is that the trial court erred in not ruling as a matter of law that the lien affidavit filed by Brown and Root was not timely filed in that it was not filed within 120 days of the "accrual of the indebtedness" on this project. Appellants argue that Art. 5467, in its pertinent parts, provides that the "indebtedness ... shall be deemed to have accrued ... upon any material *breach* or termination of the original contract by the owner, or on the tenth (10th) day of the month next following the month in which the original contract has been *completed,* finally settled, or *abandoned*" (emphasis supplied by Appellants); and that in this case the evidence clearly shows that (1) the owner materially breached the contract on or before October 1, 1972 by failing to pay installments provided for by the contract, or (2) that Brown and Root essentially "completed" the contract in September of 1972 by reason of the acceptance of the project by Houston Leisure Park when it opened the park to the public for business, or (3) that Brown and Root "abandoned" the contract in December of 1972 when it removed its equipment from the premises and failed to work on the project from that time until May of 1973, or (4) that Brown and Root "completed" the job in December of 1973 when its own field reports and invoices show that the work was 100% complete in all respects.

We agree that it is undisputed in this case that Houston Leisure Park failed to make its contractual installment payments after October 1, 1972. However, there was evidence that Brown and Root did not cease work at that time but instead continued to work toward completion of the contract and satisfaction of the owner, despite the failure to pay. Art. 5467 provides *four* alternative events which may trigger the running of the 120-day period for filing of the lien affidavit: (1) breach by the owner, (2) abandonment by the contractor, (3) completion of the project, or (4) final settlement. The law allows a contractor to continue working after the owner has breached and the continuation of work does not amount to a waiver of the contractor's right to payment under the contract. *Board of Regents of the University of Texas v. S & G Construction,* 529 S.W.2d 90, 97 (Austin C.A.1975, n.r.e.). In our opinion Art. 5467 contemplates that the contractor need not declare a breach by the owner and cease further work, but that the contractor may continue on to completion or final settlement of a project. In such a case, the latter date (completion or final settlement) should control the running of the 120-day period-not the date of the breach by the owner. We think this interpretation is more consistent with the well-established principle that the Mechanic's and Materialman's Lien statutes should be liberally construed to protect the contractor.

Appellants also insist that the evidence conclusively establishes "abandonment" or "completion" of this project prior to January of 1974. While Appellants did produce testimony and documentary evidence that raise fact issues regarding the occurrence of these events, Brown and Root also produced evidence which put the time of these events in dispute. The jury found that "the actual construction of the ... improvement and the furnishing of materials ... continued with 'reasonable diligence' on the part of Brown and Root, Inc. ... until after January 1, 1974"; and, in our opinion, the record contains evidence sufficient to support this finding. The record indicates that Brown and Root and Houston Leisure Park could not really agree as to whether or not this project had been "completed." There was testimony that Brown and Root agreed to remove its equipment so that Houston Leisure Park could have a "grand opening" on Labor Day of 1972, but that at that time it was understood by all parties that Brown and Root had not completed the job and would return-at least for clean-up purposes. Brown and Root did return and the business

records of Brown and Root show materials supplied, equipment furnished and labor utilized on the job almost continuously until about December, 1972. In January of 1973, Houston Leisure Park, by letter, informed Brown and Root of some of their objections to the work as performed by Brown and Root. Thereafter Brown and Root and Houston Leisure Park entered into negotiations to settle their differences. Soil tests were completed by Houston Leisure Park in April of 1973 and shortly thereafter additional tests were performed by an independent tester hired by Brown and Root. These tests verified Houston Leisure Park's contention that the road base was not constructed uniformly according to contract specifications. Thereafter Brown and Root promptly undertook to cure the objections of Houston Leisure Park in order to secure their acceptance of the project. Business records of Brown and Root show deliveries of materials and use of equipment and labor from January of 1972 until June 1974. Earl Cooper, and employee of Houston Leisure Park, testified that on March 3, 1974 he took pictures to mark the places where water was standing in the streets of the park, and at that time Brown and Root was still working on the site and continued to work until May of 1974. The pictures taken by Mr. Cooper were introduced into evidence for the purpose of establishing the defects in the construction; but the pictures also showed Brown and Root equipment which was on the job in March of 1974, and can also be considered in support of Brown and Root's assertion that the lien affidavit was timely filed.

In summary, the events marking the time at which the indebtedness accrued on this job were disputed and presented a fact question for the jury, and the fact finding by the jury is supported by the evidence in the record. Appellants' second contention is therefore overruled.

Appellants next attack the jury's finding that "actual construction of the improvements at the site of Houston Leisure Park was commenced, or materials were furnished to the land . . . before February 14, 1972" and assert that this finding has no, or at least insufficient support in the evidence.

In our opinion the record contains evidence legally and factually sufficient to support this jury finding. The contract was executed January 12, 1972. Mr. Williams, Manager of Brown and Root's Civil Division, who was responsible ultimately for the construction of this project, testified that the job was started in January, 1972. Mr. Reidenbach, an employee of Houston Leisure Park and supervisor of this construction at that time, testified that the job started in January, 1972, that at that time Mr. Bailey, a Brown and Root Engineer, began laying out the streets and roadways, marking them with lath stakes with red flags on top. He testified that anyone who went on the property could have seen the stakes marking the roads. He further testified that a bulldozer was at work at about the same time clearing the land marked for roads and parking sites and that anyone coming on the property could have seen the bulldozer and the effects of the bulldozer's work. Mr. Bailey, the Field Engineer of Brown and Root, could not set an exact date on which he began work, but he could estimate the date as sometime in January of 1972, because he bought a machetti on January 25, 1972 and that this purchase was made at about the same time that he began working on the job. Mr. LaRose, Field Office Manager of Brown and Root, produced business records which showed that charges made against this job for January of 1972 included charges for a bulldozer, which was on the job three days (one day idle) during the month of January. Mr. Bailey testified that the first thing he did after attempting to reconcile the site drawing with the actual site itself, was to lay out the main road through the park; that he had the bulldozer clear a path from the front to the rear of the park; that this was a critical phase of the operation because "I was fixing to bulldoze in trees out there," and "if something went wrong I had done destroyed a whole lot of trees"; that this was the first stage of the operation because all of the other roads in the camp came off of this main road; and that all of this

preliminary work was done and that crews were clearing and constructing in less than three weeks. No witness testified that the actual construction was begun on a later date than February 14, 1972.

The activity of clearing and grading the land is an activity that clearly constitutes "commencement" of construction within the meaning of Art. 5459. *Diversified Mortgage Investors v. Lloyd D. Blaylock, Gen. Contr. Inc.*, 576 S.W.2d 794, 801 (Tex.1978). The Supreme Court held in *Blaylock* that under the "commencement of construction" requirement of Art. 5459, the inception of a Mechanic's and Materialman's lien occurs when the "activity commenced" is actually conducted on the land, is visible on the land, and when it constitutes an activity that is either defined as an "improvement" under the Texas statute or involves the excavation for or laying of a foundation for a building. The word "improvement" specifically includes the "clearing, grubbing, . . . of land," Art. 5452; and so the Supreme Court held in *Blaylock* that such activity was sufficient to constitute inception of the mechanic's lien. Thus the activity of Brown and Root in clearing the land in this case should, as a matter of law, be sufficient to constitute inception of the lien, and we hold the jury finding that the activity occurred prior to February 14, 1972 is supported by legally and factually sufficient evidence. Appellants' third contention is overruled.

Appellants' fourth contention is that the trial court erred in declaring Brown and Root's lien prior to that of Reliable because Reliable was entitled to a first lien by virtue of its equitable subrogation to a prior vendor's lien on the property.

At trial, Reliable attempted to establish a first lien on the property in question first by tracing its lien to the first Deed of Trust lien acquired by Texas First Mortgage REIT which was filed of record on February 14, 1972. The commencement of construction by Brown and Root prior to February 14, 1972, defeats Reliable's claim to priority if the claim is merely based on the February 14, 1972, Deed of Trust lien. *Diversified Mortgage Investors v. Blaylock*, cited supra. However, Reliable also attempted to establish its right through equitable subrogation to vendors' liens which had existed on the property prior to the Deed of Trust lien of Texas First Mortgage REIT. It is this priority that Reliable asserts in its fourth contention on appeal. In support of this claim in the trial of the case, Reliable first introduced a General Warranty Deed to property which included the property in question (but was *not limited to* the property in dispute). The deed was executed on November 30, 1971 and conveyed the property from "E. G. Payne, Trustee" to "R. T. Marshall, Trustee" [2] and recited that part of the consideration for the execution of the deed was "that Grantee accepts this conveyance subject to, but does not assume the payment of all principal and interest now remaining unpaid on that one certain non-personal liability promissory note described as follows:

> "Promissory note dated April 14, 1971 in the original principal sum of $170,000.00, bearing interest at the rate of 7% per annum executed by E. G. Payne, Trustee, payable to the order of Laveta J. Wilburn and Mabery G. Wilburn in annual installments as therein set forth, the payment of which note is secured by a vendor's lien retained in Deed of even date therewith from Laveta J. Wilburn et al. to E. G. Payne, Trustee, recorded in Volume 8395 at Page 221 of the Harris County Deed Records, and is additionally secured by a Deed of Trust of even date therewith from E. G. Payne, Trustee to A. A. Mosley, Trustee, recorded in Volume 7547, at Page 104 of the Mortgage Records of Harris County, Texas."

and further recites that part consideration for the execution of the deed was the "sum of FIFTY FOUR THOUSAND FOUR HUNDRED DOLLARS ($54,400) secured to

2. R. T. Marshall was an investor in Houston Leisure Park, and was President of the corporation that took over the management of Houston Leisure Park. He was originally joined as a Defendant in this suit but was nonsuited early in the trial.

be paid and evidenced by Grantee's one certain promissory note described as follows:

> "Promissory note of even date herewith in the principal sum of FIFTY FOUR THOUSAND FOUR HUNDRED DOLLARS ($54,400), bearing interest at the rate of seven per cent (7%) per annum from date until maturity on the whole of such principal sum remaining from time to time unpaid and bearing interest at the rate of 10% per annum from maturity until paid . . ."

and the deed recited that "Grantor expressly reserves and retains for himself, his successors and assigns, a vendor's lien and superior title in and to the above described property, premises and improvements until aforesaid Note in the original principal sum of $54,400.00 . . . has been fully and finally paid . . .", and that the note "is further secured by a Deed of Trust of even date herewith from Grantee to MICHAEL R. PICKERING, Trustee."

Reliable also introduced into evidence a General Warranty Deed conveying only the property in dispute in this case from R. T. Marshall, Trustee, to Houston Leisure Park, which deed was executed on January 31, 1972. This deed made no reference to, nor did it reserve any vendors' liens on this property. Reliable also placed in evidence a promissory note executed by Houston Leisure Park to Texas First Mortgage REIT on February 11, 1972 in the principal amount of $350,000.00 and a Deed of Trust securing the same which was filed of record on February 14, 1972. In an attempt to establish the fact that part of the proceeds of the $350,000.00 were applied to the payment of the vendors' liens notes, Reliable produced a copy of a ledger sheet from the records of Stewart Title Guaranty Co. which contained the following information:

RECEIPTS

| Date | From | Amount |
|---|---|---|
| 2/18/72 | Tex. 1st Mtg. REIT | $111,637.65 |

DISBURSEMENTS

| Check No. | Check To | Amount |
|---|---|---|
| | Stewart Title Guaranty | 869.50 |
| 26859 | Attorney's Fees: Vinson, Elkins | 545.00 |
| 26860 | Liens: Tex. First Mtg. REIT | 3,500.00 |
| 26861 | Laveta J. Wilburn & Maybery C. Wilburn | 67,897.55 |
| 26862 | E. G. Payne, Trustee | 38,798.60 |
| | TOTAL | $111,637.65 |

R. T. Marshall, in identifying this ledger sheet testified that part of the funds received from the $350,000.00 were used to pay off the indebtedness evidenced by the deed from E. G. Payne to R. T. Marshall. The exact wording of the testimony was as follows:

"Q. Mr. Marshall, you said that there was a payment made out of that $350,000 to pay off the indebtedness that is evidenced by this Deed (from Payne to Marshall)?

A. I said there was a release payment made, that's right.

Q. All right, sir. How much was paid? The whole amount in or only a part of it?

A. Just enough to release the land. We released it from the first and second mortgage and it's delineated there in the closing statement.

Q. So then, your testimony is that–now that the entire indebtedness evidenced by this was not paid off by the–out of this $350,000?

A. I'm not sure what you are–if you are talking about the 19 acres (the property in dispute in this suit), it was paid off. If you are talking about the 55 acres (the larger piece of property which included the 19 acres in dispute here), it was not paid off."

Reliable contends that this evidence is sufficient to conclusively establish its right, through equitable subrogation, to a first lien on the property.

Where purely equitable subrogation is in issue, each case must be controlled

by its own facts. *Providence Institution for Savings v. Sims*, 441 S.W.2d 516 (Tex.1969). While there is perhaps some evidence in this case to raise a fact issue as to whether funds on loan from Texas First Mortgage REIT were in fact used to discharge the vendors' liens retained on the property in dispute, the evidence is far from conclusive in this regard. No releases of the liens executed by the vendors Wilburn and Payne were introduced into evidence at the trial. Although the ledger sheet referred to above was introduced into evidence without objection, the information and figures contained therein are purely hearsay in this case. The ledger sheet was not proved up under the business records' exception or any other exception under this record. Furthermore, Mr. Marshall himself testified that he did not know the exact amounts that were paid to discharge the liens and he therefore had to refer to the ledger sheet to obtain this information. Thus there was really no competent evidence as to the amount of the funds if any that were expended to discharge the indebtedness.

Furthermore, even if the facts are sufficient to raise an issue regarding the discharge of the prior indebtedness and the extent to which Reliable was therefore subrogated to the vendors' liens, no issues were submitted regarding these facts. Reliable neither objected to the failure to submit such issues nor did it submit issues that were refused on these points. We must therefore conclude that the court made implied findings which are in support of the judgment. Appellants' fourth contention is overruled.

Appellants' fifth contention concerns the amount of the recovery awarded by the judgment. Appellants argue that the figure $93,729.99 exceeds the total contract price by some $2,126.73, and that the recovery should be reduced by this amount since there was no issue inquiring specifically as to whether Houston Leisure Park had authorized any "extra" work under the contract. There was introduced into evidence an invoice dated March 30, 1974 which billed Houston Leisure Park for "labor, equipment and materials to perform extra work to contract dated 1/13/72 ..... total amount due, $2,126.73." This was introduced without objection and neither Reliable nor Houston Leisure Park made any objections to the damage issue which allowed the jury to consider this work as part of the contract. Any error in this regard was therefore waived and will not be considered on appeal.

We have thoroughly reviewed the record and have carefully considered all of Appellants' remaining points and overrule the same as being without merit. The judgment of the trial court is affirmed.

AFFIRMED.